The Honorable, the judges of the United States Court of Appeals for the Eighth Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this honorable court may now draw near and they will be heard. God save the United States and this honorable court. Good morning. Thank you to counsel for joining us for this argument session this morning. The court has five cases set for argument. Madam clerk, please call the first cases for argument. Very well, Mr. Murphy, we'll hear from you first. Thank you, your honor. Good morning to you all. I appreciate the opportunity to argue this on behalf of Mr. Long Pumpkin. As the court knows from the briefing, Mr. Long Pumpkin raised three issues. The second and third issue go to the sufficiency of the evidence and I would re-allege the arguments and authority I set forth in the brief. With the court's permission, I'd like to focus on the first issue, which is whether Mr. Long Pumpkin's confrontation rights were violated when the court placed limitations on his ability to cross-examine two witnesses, Swan and Heitheit. I believe that the trial court misapprehended the issue when it came to these two witnesses. The court alleged that the proposed cross-examination was only to a merely collateral matter and I don't believe that's accurate. The issue was whether Mr. Long Pumpkin could elicit facts on cross-examination that went to the accuracy and reliability of the testimony presented for Swan and Heitheit. Essentially what he wanted to do was examine them about their drug use before the crime alleged, during the crime alleged, after the crime alleged, up to two days before the trial when they showed up for the trial high on methamphetamine. Throughout the arguments on this issue, we had two hearings on it, Long Pumpkin always framed this as an accuracy and reliability issue and I submit accuracy and reliability are never collateral. When we look at what the foundation of the rules of evidence, the rules of procedure, and the confrontation clause are, they are to assure that juries get accurate and reliable evidence and if they don't that that is exposed to them. What's interesting about this case is that the court had to consider the same issue regarding another witness, witness Perry, and that was never really never became an issue or it became moot because Perry was found in contempt and refused to testify. But the first time this issue was raised was in regard to Perry and the court got it right there. The court told at that hearing, the court said that the defendants would be able to fully examine Mr. Perry about his drug use before, during, and after the crime and his recent drug use because it believed that the jury needed to understand that. The court said that there was quote, well it said that this testimony or this kind of cross examination was necessary to quote determine the ability to recant and recall matters, unquote, and that the it said that the jury quote may be impacted by very recent and continuous drug use, unquote. So the court when it came to Mr. Perry understood that this was essential to go to reliability and accuracy but then a day later when we got to Swan and High Pipe, the court went 180 degrees and said we can't examine them in any way regarding their drug use. Mr. Murphy, what what other evidence was there about drug use on the part of other participants? Very little. There was a testimony that when they he rolled the joint but they didn't actually start smoking it and so there was very little in regard to drug use even though that was a context of this case that everybody, at least all the witnesses involved, were high on methamphetamine during the incident but we were never able to elicit any of that information. So did the jury have a sense that that there was anyone that was under the influence of any kind of meth or any kind of drug, in other words, were, I'm sorry I'll use their first names because I think some of the briefing had Vanessa and Jessica, were, was there any, based on the totality of the evidence, would the jury walk away thinking that those were the only two sober people because of this? I think they would get the idea that there was no evidence indicating that any of them were intoxicated or impaired that because they were really the two essential fact witnesses and that's what's what's inexplicable about the court's reversal of course when it went from Perry to Vanessa and Jessica. These were the two most important witnesses, fact witnesses, because they they were there allegedly continuously from before the carjacking throughout it and then for weeks after and so and their drug use was much more recent. Remember they came to court high. In Perry, he said his last drug use was six to seven weeks ago so if there was ever witnesses where we needed to draw out that their ability to accurately and and correctly perceive and recall events was at issue, it was these two witnesses and there really was very little presented to the jury from which they could ever call into question the direct testimony provided by those witnesses. I believe you know the the case law we cited supports this. Before you go into the case law, may I ask you one other factual question? Sure. Were each of these women in a position to know that the other had used methamphetamine? They could have testified that they observed the other on occasions using methamphetamine. We don't know what they would have said about the in question because they played different roles. Swan was with the Sol Pro at the Walmart and then High Pipe joined the group later, but that was a point raised by the the government. The judge said he specifically approved that approach. You could have asked them. You declined to do so and that's a critical factor that weighs against your argument. Well, but neither of them would have been able to say how the drug use impacted the other's ability to perceive and recall events. It would be merely speculative. So we can't ask High Pipe whether Swan was so under the influence before, during, or after that she has trouble remembering things or trouble perceiving things. Only the witness could answer that and that's what the essential difference is. As we often get in these cases, a witness will admit that their drug use has impaired their abilities to remember things, that they get scrambled, that their high level of usage has confused them and they're disorganized. None of that could be elicited through a third party and that's what I don't think the court understood when we were making this argument. I've run out of time and my co-counsel will take the remainder. Thank you for your offer. Very well, thank you for your argument. Mr. Davis, we'll hear from you. Good morning. My name is Eric Davis and it's a privilege to argue this case on behalf of my court. I do want to talk just briefly about the Confrontation Clause issues and we've also raised several claims related to the sufficiency of the evidence that require a pretty deep dive into the record and the witness testimony and with our limited time today it would be my intention to rely on the arguments and authorities in our briefing for those matters. I intend to speak mostly about the question of whether the carjacking was a completed event by the time my client arrived on scene but I'd be happy to go towards the Confrontation Clause issues if the court directs me there. But that is the one prominent issue in this case that I think resolves all others is whether the district court erred when it denied our motion for judgment of acquittal on counts one and count two because the jury convicted my client of a carjacking that was a completed offense before anyone says he ever arrived on scene. When Saul Crow, Vanessa Hydepipe, Jessica Maho, and Zach Perry were passengers in the white van Philip Moore was driving from Walmart on October 13, 2017, Saul Crow pulled out a gun from his place in the back seat of that van, pointed it at Mr. Moore, and directed him to go to a location he did not want to go. This is the textbook hornbook definition of a carjacking and no one really seems to dispute that. Eventually the government also doesn't dispute that my client was not there when this occurred. He was not in that van. Now eventually the van stopped and Mr. Moore was immediately pulled into the back of the van by Mr. Longpumpkin and restrained while Saul jumped in the front seat, drove the van to another location. Because Mr. Moore went from being dispossessed of control at gunpoint and then physically dispossessed in the back of the van and incapacitated, no one has claimed that he ever regained possession of the van at any point that evening from the precise moment Saul took possession and control of that van until much much later in the rendezvous with the van and the passengers at some point later and then assaulted Mr. Moore. Assuming of course as Mr. Murphy mentioned the accuracy of Ms. Highpipe's observations in that regard can be trusted. But the only evidence that my client was ever present at all was the testimony of Vanessa Highpipe and Jessica Maho who didn't even know my client very well and as Mr. Court entirely prevented us from raising any questions that these witnesses were high on meth at the time of the carjacking, used meth for years before, used meth for years after and showed up to the trial high on meth. But for the sake of argument let's assume their account of what they claim they saw that night is reliable and accurate. Even then the carjacking was over by the time the this court has defined a carjacking as the acquisition by the robber of possession, dominion or control over the property for some period of time. The carjacking... Mr. Davis, is there a difference between the taking of the car and the maintaining of the car? Yes, I think... Is that a meaningful distinction for purposes of your argument? I do think, Judge Kelly, it's a meaningful distinction because I think the carjacking statute criminalizes the manner in which the car is acquired, not the unlawful manner in which it may be possessed after it is unlawfully acquired. That may be a different crime such as possession of stolen property, but a carjacking is the dispossession, the taking of possession, which the Supreme Court held in Holloway directs the fact finder's attention to the exact moment acquisition was acquired. Now, in Wright, this court, a different carjacking case in Wright, this court said that it was reasonable for a jury because there was evidence to support the idea that the carjacking of the valet could have taken several attempts or even several moments to attempt in that very short window maintained, but we don't have those same facts in this case. And the government made the same argument in Petrick, essentially what this court called an overbroad reading of Wright. The government made the argument that this carjacking in Petrick, cited in our brief, was an ongoing event and this court explicitly acknowledged that argument and it took... Could you go through the facts at the second location? I mean, not in depth, but the key facts at the second location taken in the light most favorable to the verdict? Yes, Judge. In the second location, are you referring to Nike Road, which would be the last location or the Ramcoda? Yeah, I thought there were three places, the Walmart, the Ramcoda, and the Nike Road, but I should have been more explicit. No, I understand. At Nike Road, the evidence... I'm not referring to Nike Road. Excuse me, I misspoke. At the Ramcoda, the evidence in the light most favorable to the jury is that Mr. Moore drove to the Ramcoda under gunpoint, that one witness claims to have seen my client be present and to have run to the side of the driver's door. Now, that testimony was contradicted by the victim, Mr. Moore, who said it was Saul Crowe that ran to the driver's side door. The witnesses seem to be in unanimous agreement that Mr. Longpumpkin entered the van, pulled Mr. Wright to the back seat of the van, and then the van took off and sped away, and that is the extent... When you say pulled Mr. Wright, do you mean pulled Mr. Moore? I do mean that, excuse me. Yeah, and at that point at the Ramcoda, Moore was in the driver's seat of the car, is that right, before Longpumpkin pulled him out, and did he have control of the vehicle at that point? Was he operating the vehicle? He was operating the vehicle, but I don't believe that he was in control and possession of a vehicle, because I don't think you can be in control of a vehicle when you're being directed at gunpoint. That, I believe, was the carjacking. There is no evidence in this record that Mr. Moore ever regained control of the van from that precise moment when Saul Crowe pointed a gun at him and made him drive somewhere he didn't want to drive. In this case, the evidence is undisputed that my client was not even present when Saul Crowe dispossessed Mr. Moore of his van by force, so the idea that he participated in a carjacking is a legal impossibility. Mr. Moore was fully and permanently dispossessed of his van by the time any witness claims my client was present. No one claims that he regained possession or even had the ability to attempt to regain possession. Accordingly, Mr. Crowe is entitled to a judgment of acquittal on count one, and as it concerns count two, discharge of a crime of violence, the same authority requires the same result. Even if the evidence was to be believed that my client discharged a firearm at Nike Road, which we can't believe based on the testimony of the witnesses, that did not happen during and in relation to a carjacking because the predicate crime of violence is not present. With that, if the court doesn't have any questions, I would respectfully ask to reserve the remainder of my time for rebuttal. Yes, you may. Excuse me. You may do so. Thank you for your argument. Mr. Kelderman, we'll hear from you. Thank you, Your Honor. May it please the court and counsel, I'm Eric Kelderman, representing the United States in this appeal. I'll go to the most recent issue that was discussed by counsel a moment ago. The carjacking in this case, what occurred starting at when the people got into the vehicle at the Walmart. Not long after that, Saul Crowe puts a gun to Phillip Moore's head, puts a gun to him and directs him where to go. Right after he did that, he directed Jessica Swan to make a phone call. They go to the Ram Coda. They arrive at the Ram Coda in Moore driving. Immediately, both defendants, Long Pumpkin and Moses Crowe, show up at the vehicle. At that point, I believe there were two witnesses that testified that Moses Crowe punched Moore and then all the activity occurred in that vehicle where Moore is dragged out, taken to the back. He's being choked out by Long Pumpkin and they drive. I believe that was where Saul drove the van and they started leaving. Moore did not and was not able to ever regain control of that van, but it wasn't for lack of trying. It was because the defendants acting in concert with each other. Like I said, the other two, the defendants in this case, came to the van. It began right there. Well, it began earlier at the Walmart, but it continued there. Mr. Kilderman, was there a completed carjacking at the time that Saul Crowe put the gun to the driver's head and told him where to go? Would you consider that in presenting that to a jury? Is that a completed carjacking? Your Honor, I would submit that it was not until he lost control completely. What does it mean to lose control completely? Because if he had the gun to his head, what control remained in the driver's hands at that point? Well, he was still driving the vehicle. He was still in the seat. And so I look at when the court was talking earlier with counsel about the Wright case and the Petrick case. This is far more akin to Wright, where the driver, the valet, had walked away from the vehicle, had gotten some distance away, left it running. Then the defendant in that case got into the vehicle and started to take off. The valet tried to reassert dominion or control over the vehicle by going up to it, standing in front of it, attempting to get the thief to stop, and even tried to open the door. Understandably, the circumstances here are somewhat different because there are guns involved. So in this particular case, if they had just gone to the Ram Coda and the other two fellows had not shown up, Moses Crowe and Mr. Lompomkin, would there have been a carjacking? I believe that if Mr. Moore had been taken out of the vehicle or kicked out of the vehicle, if he had lost control completely, then certainly... So you're saying so long as Mr. Moore stays in the car, a defendant has not committed a carjacking? I suppose, Your Honor, that arguably it could be completed by any number of the acts here. It could have been completed at that point. But in this circumstance, we have an offense that just kept on going. That seems to be kind of a different question, though, whether it's ongoing. So your position is it's ongoing? It's not that it wasn't completed? I'm not really quite sure I understand the difference between... ongoing carjacking, if it isn't just simply taking control and then maintaining control of the car for however long that might be. Your Honor, I believe that it could be considered complete when he loses control. And that's what I guess I'm trying to like in this case. I believe that it is similar to Wright in that there are a number of assertions there by the valet where he was trying to regain control, where he was trying to keep control of the vehicle. In this case, Mr. Moore was prevented from doing so by being repeatedly strangled, by being held down in the back, by having a gun pointed to him, by being dragged out of the vehicle, by being knocked unconscious at Nike Road, which is what ultimately happened. None of those things, a number of those things wouldn't be necessary if he had lost control of the vehicle. They kept on going with this carjacking, much like the driver, the thief in the Wright case where he tried to drive away. He tried to, he drove very quickly at the valet who was trying to get the vehicle back. So all of these things continued this offense. If they had stopped, if he had been kicked out of the vehicle, I believe it would have been completed and there would not have been. For example, at the Ramcoda, if they had dragged him out and left him there, or if it had happened earlier where Mr. Moore had been taken out, before they got to the Ramcoda, those certainly would have been a completed carjacking. But here, it kept on going. They kept on doing different things, causing him to not be able to regain control. No matter what he did, he was fighting back. They wrestled. He wrestled with Mr. Long Pumpkin in the back of the vehicle. And so all of these things were continuing and it was continuously going on. And I believe under Wright, that would constitute a carjacking and an ongoing carjacking. Can I ask a question about what the evidence is that the driver was trying to maintain control? Because I think the fact that they dragged him out and assaulted him doesn't necessarily mean there was evidence he was trying to maintain control. It could be just an assault. So what was the record that he was trying to maintain control? He was prevented from doing so, Your Honor. He was in the back. And so he had no ability. He was not able to get back into that driver's seat. He certainly wasn't saying, please take my car or kick me out of here, anything like that. He was prevented from doing that. And how about before he was in the back? Didn't he testify that when he was at the Ram Coda and the perpetrators jumped out, he tried to turn on the car and put it in reverse and get out of there? He absolutely did, Your Honor. And so earlier at that point when he tried that, when Long Pumpkin grabbed him and pulled him out of the driver's seat. Do I have the chronology right? That's right. I believe that's exactly the chronology of that, Your Honor. Then why isn't that the Petrick case? That just trying to get the control again doesn't make it a second carjacking? Well, Petrick involved two completely separate incidents. In that case, the car was taken. The vehicle was gone without anyone ever realizing it. It happened 10 to 15 minutes, I believe, before the vehicle owner's son who got called and was headed toward, I believe it was the parent's house. That's where that individual, the son, came across the vehicle and stopped and confronted the person who had taken it. That taking was not a carjacking at all because it had occurred, and that's what this court found, the taking was complete and never even involved a carjacking. The fight that occurred and the struggle that occurred at that point was not a carjacking because it never started to be any such thing. Now, here, basically, Moore was held hostage. From the Walmart on, he did, as Judge Colleton mentioned, try to put it into drive and get away or put it into reverse. He was never able to do that because he was held hostage. I cited in the United States brief a case from it was the Fourth Circuit Court of Appeals, I believe it was. I cannot find the reference right now. Basically, it says that as long as a person is being held hostage during this thing and until they're gone and away from the vehicle, the carjacking is continuing and it's ongoing. I'll move on to the issue about cross-examination of the witnesses. The district court, with regard to Jessica and Vanessa, the names that are used in my brief, at least, the United States brief, the court was faced with a situation where there are two witnesses who were asserting a Fifth Amendment privilege as to any drug use. The court reviewed it extensively in the record, talked to counsel about problems that they might face if they testify, if the issue of their drug use came out during their testimony. The court found that they would be subject to problems in state court, even if immunity were given to them with regard to their testimony. State courts, probation could still be taken away from them or they could face jail time. He found that, Judge Bikin found that the prejudice and the potential downside for them was real. Faced with that situation, the court had to balance Fifth Amendment rights of those two witnesses versus the defendant's Sixth Amendment, I'm sorry, of those witnesses versus the defendant's Sixth Amendment rights. The Singer case addressed that squarely and a few other cases that the district court cited and that are in the United States brief as well. The situation is almost the exact same thing. The court had to do something, it had to strike a balance. And so it made the ruling that it did. It did not preclude the defendants from cross-examining the witnesses as was discussed earlier. Having other witnesses talk about these witnesses and their drug use on the night of the event, it didn't preclude cross-examination about how these defendants were acting. Why isn't this different though in the sense that to cross-examine someone else about the witness's ability to perceive the events of the night? I mean, these are your eyewitnesses to the crimes that you've alleged and charged. And so why isn't that a fundamental difference here in terms of what a defendant should be able to do on cross-examination to make the jury understand whether or not the witness was able to perceive, particularly when there were some inconsistencies already in the record as to what had happened? Your Honor, I don't disagree that this was some important testimony. But certainly they were not the only witnesses that evening. And Mr. Moore, other than identifying defendant Moses Crowe by name, he provided enough evidence across the board to sustain the convictions here. Understandably, it is an important right to be able to cross-examine. But what the district court did was it came up with a balance because the two rights, the rights of the defendants and the rights of the witnesses, had to be reconciled in some way. It came up and it said, you can cross-examine. It came up with alternatives, just as the Singer Court discussed where the ability to cross-examine, the ability to impeach witnesses by other means. When the testimony that's being stricken or the testimony that the defendants are not allowed to cross-examine the witness about, when it's not about the substantive issues of the case, but instead is a collateral issue. The United States did not call impeachment or credibility of witnesses a collateral matter. That was this court in Singer and in the cases that followed it. Indeed, an important right to be able to cross-examine, but the court had to strike some sort of balance. And it did. And it offered the opportunity for these defendants to talk about the drug use by those witnesses in other ways. Again, they had significant criminal histories. Their credibility was attacked. It just wasn't attacked in the same way as perhaps in a normal case it would be. But it was. They were able to impeach. They could have asked questions about the reputation for truthfulness of the witnesses in the community or even in this limited group of friends. They could have asked questions about how they were acting. I'm just saying that there were other avenues that could have been explored and largely were not. The district court noted that Singer was binding on it and it did its best. The United States submits to attempt to abide by Singer and to follow what it said about handling a situation like this. As the district court noted in its order denying the motions for new trial or for judgment of takes away a witness's credibility. Just the fact that they may have used drugs or had used drugs days earlier or years earlier when preceding the events involved in a crime, it doesn't automatically make their testimony incredible. What if the testimony had been about some other kind of physical or perception limitation? Like not wearing glasses or having some kind of eyesight limitation or hearing limitation. What if that kind of a restriction were imposed? Putting aside what I can't really envision when that would happen, but what about restricting that kind of cross-examination? Is that in the same category as drug use when it comes to the ability to perceive and understand and appreciate what's going on? Perhaps it is, your honor. But the difference that I would see is that would not be an illegal act, nothing where the Fifth Amendment would come in to have any impact on it. And so the situation we have here, had during the trial and have here, is one where the district court was doing its best to apply this court's precedent to balance and to deal with the conflicting rights of witnesses and the defendants. And it did, in applying Singer, it did that to the best of its ability. And it even wrote about that later, about how it had attempted to do so without doing as little damage to the defendant's rights, while still doing no damage or doing little damage to the witness's rights. And so it was a situation where the district court did all that it could. It balanced those rights and it followed Singer. And the United States asked that the court affirm the convictions of the defendants in all respects. Thank you. Very well, thank you for your argument. Mr. Davis, we'll hear from you in rebuttal. Thank you, Judge. I would like to take issue with some of the facts as the government relates them and its argument. But first, the fact that the government fails to mention during its argument on the confrontation clause issue is that Jessica and Vanessa voluntarily walked into a United States federal building and voluntarily confessed to being presently high on methamphetamine to government prosecutors, which happens to be a crime in the District of South Dakota. Every time one of my clients confesses a crime to the government, the government responds that they have waived their Fifth Amendment rights against self-determination. And every time they are correct. Frankly, I don't think this court needs to reach the issue of whether the district court properly applied the Singer balancing test. Because frankly, I don't think either of these clients had any Fifth Amendment privilege for two separate and independent reasons. The first is that they waived it. And the second is that they had a grant of full and total state and federal immunity. So it's not clear to me what real risks these witnesses had in testifying, even when every attorney in the room suggested even the government's own prosecutor who had been a state prosecutor had never seen an instance where someone had been prosecuted for ingesting a drug because of his or her testimony in a federal unrelated trial. As far as some of the issues with the evidence, um, the government claims... Counsel, was this argument about waiver of the Fifth Amendment right and a grant of immunity, were those presented to the district court? I believe they were, Judge. I cannot say that to you with absolute certainty. But I do believe that we argued the waiver. We had an extensive conference, closed conference, talking about these issues. No one had any idea. You know, we had prepared this case. You know, of course, the entire... the government's entire case was built on eyewitness testimony. And that is how we prepared to try this case, was to argue that these witnesses were not credible. We had... I noted that district court dealt with this extensively and did some research, took some time to do some research. And I just didn't recall the waiver and the grant of immunity argument being raised. Maybe it's there and I just didn't see it. That's why I asked the question. It may be, Your Honor. I cannot point right now to a place in the record where that occurs. Didn't Judge Viken say that he was concerned that the state courts could take action on the parole and probation status of the witnesses? Even if the prosecutors didn't proceed with a separate prosecution? I do believe he did say that. Everyone thought... Wouldn't that be a legitimate basis for the witnesses to invoke their rights? Potentially, but that still, Judge, would not outweigh their rights to avoid state probation on drug court charges would not outweigh my client's right to confront and cross-examination. That's a different question of the balancing, but you were making the point that they didn't have any Fifth Amendment right at all. I was just responding to that. My question was responding to your argument that they had no Fifth Amendment interest at all. I think they may not have when they walked into the courthouse and confessed a crime. That, to me, would have waived their Fifth Amendment privilege. I'm not following that. If a person goes and admits to a third party that they did something illegal, do they then waive their Fifth Amendment rights if they're called before a grand jury or a court? It happens all the time where people have made admissions outside of the court, but they can still claim their Fifth Amendment rights in the court proceedings. The government could call the third party as a witness against them, but I'm not tracking why that's a waiver. Maybe I'm missing it. I see my time has expired. May I respond? Please, yeah, please. I think in this case, the district court, it depends on who the prosecutor or who the witnesses made this statement to. They made their statements to government prosecutors, so whether it was a waiver or whether those statements would have been, excuse me, otherwise admissible against the statements against interests, they made them. I see, okay. Well, thank you for your argument. Thank you to both Mr. Murphy and Mr. Davis for accepting the appointments in these cases under the Criminal Justice Act. Thank you to all counsel for your arguments today. The case is submitted. The cases are submitted and the court will file a decision in due course.